# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF OHIO
## WESTERN DIVISION AT DAYTON

DALE TOBIN,                                  :

      Petitioner,                          :        Case No. 3:08cv00433

 vs.                                         :        District Judge Walter Herbert Rice
                                             Magistrate Judge Sharon L. Ovington

ED BANKS, Warden,                            :
Hocking Correctional Facility,[1]
                                             :
      Respondent.                          
                                             :

whole.  Tobin asks the Court to "issue the writ and terminate [his] unlawful confinement.

. . ."  (Doc. #2 at 43).

## II.    State-Court Litigation:
     <u>Trial, Appeal, and Remand for Resentencing</u>

At the conclusion of Tobin's trial in the Greene County, Ohio Court of Common

Pleas, the jury found him guilty of committing one count of gross sexual imposition

(victim one – C.T.), ten counts of rape (victim two – E.T.), and ten counts of gross sexual

imposition (E.T.).  (Doc. #7, Exhibits 5-6, 13-14).  Each victim of these crimes was under

age thirteen.  E.T. is Tobin's granddaughter.

On November 30, 2005, the trial court sentenced Tobin to an aggregate sentence of

thirteen years in prison.

Tobin, through counsel, filed a timely direct appeal of his convictions in the Ohio

Court of Appeals.  On March 23, 2007, the Ohio Court of Appeals sustained in part and

overruled in part Tobin's assignments of error.[3]  In so doing, the Ohio Court of Appeals

reversed ten of Tobin's convictions (Counts 1, 16, 17, 24-30) and affirmed his remaining

convictions.  *State v. Tobin*, 2007 WL 867624 (Ohio Ct. App. March 23, 2007).  In

addition, because the Ohio Court of Appeals concluded that Tobin's sentences were

unconstitutional under *State v. Foster*, 109 Ohio St.3d 1 (2006), it remanded Tobin's case

---

[3]  The Ohio Court of Appeals' decision graphically describes the evidence presented at trial
concerning Tobin's criminal misconduct.  *See, e.g., State v. Tobin*, 2007 WL 867624 at *2-*4 (Ohio Ct.
App. Mar. 23, 2007).

to the trial court for resentencing.

On remand, the trial court again sentenced Tobin to an aggregate sentence of thirteen years. (Doc. #7, Exhs. 13, 14). This occurred on May 9, 2007.

Meanwhile, on May 7, 2007, Tobin's counsel filed a timely notice of appeal in the Ohio Supreme Court raising three statements of error:

1. When a Court of Appeals declines to review a claimed error alleging the unconstitutionality of a prior decision of this Court, it violates the Supremacy Clause of the United States Constitution and unlawfully deprives the appellant of the right to appellate review of the claim, in violation of the right to redress and due process guaranteed by the Ohio Constitution and the right to Due Process guaranteed by the United States Constitution.[4]

2. When a reviewing court analyzes the prejudice prong of the *Strickland*[5] test for ineffective assistance of counsel, the court must consider the record as a whole and evaluate the probable impact of counsel's error in light of all the evidence to which the jury was exposed. If the court focuses its prejudice inquiry on isolated factors to the exclusion of other factors that influenced the jury's verdict, it violates the accused's rights to counsel and to due process under the Ohio and United States Constitutions.

3. The trial court's sentencing Mr. Tobin to non-minimum and consecutive prison terms violated Mr. Tobin's rights under the Sixth Amendment to the United States Constitution. *Blakely*..., 542 U.S. 296 . . . .

(Doc. #7, Exh. 18 at 280)(footnotes added). The Ohio Supreme Court declined to exercise its discretionary jurisdiction and dismissed Tobin's appeal "as not involving any substantial constitutional question." *Id*., Exh. 20.

---

[4] Under the Supremacy Clause, the United States Constitution "shall be the supreme Law of the Land; and the Judges in every State shall be bound thereby, any Thing in the Constitution or Laws of any State to the Contrary notwithstanding." U.S. Const. Art. VI.

[5] *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052 (1984).

3

Tobin took no further steps in state court.  He turned instead to this Court seeking

habeas corpus relief with the following claims:

Ground One:         Petitioner's right to due process of law, as guaranteed by the Sixth
                    Amendment to the United States Constitution, was violated when the
                    [Ohio] court of appeals declined to review a claimed error alleging
                    the unconstitutionality of a prior Ohio Supreme Court decision.

Ground Two:         Petitioner's rights to counsel and due process, as guaranteed by the
                    Sixth Amendment to the United States Constitution, were violated
                    when the reviewing court, while analyzing the prejudice prong of the
                    *Strickland* test for ineffective assistance of counsel, failed to look at
                    the record as a whole.  Rather it focused its prejudice inquiry on
                    isolated factors to the exclusion of other factors that influenced the
                    jury's verdict.

Ground Three:       The trial court's imposition of non-minimum and consecutive prison
                    terms violated Petitioner's rights under the Sixth Amendment to the
                    United States Constitution.  *Blakely v. Washington* (2004), 542 U.S.
                    296, 124 S.Ct. 2531.

(Doc. #2 at 46).

III.    **Procedural Review**

        A.      **Procedural Default and Waiver**

        A state prisoner seeking a writ of habeas corpus must first present the state courts

with his federal constitutional challenges to his conviction and sentence.  "'[S]tate

prisoners must give the state courts one full opportunity to resolve any constitutional

issues by invoking one complete round of the State's established appellate review

process.'"  *Williams v. Bagley*, 380 F.3d 932, 967 (6th Cir. 2004)(quoting *O'Sullivan v.*

*Boerckel,* 526 U.S. 838, 845 (1999)).  To accomplish this, the prisoner must fairly present

his federal claims to the state courts by following the state's adequate and independent procedural rules.  If the prisoner violates those rules, he risks committing a procedural default that might forever block his path to obtaining federal habeas review.  *See Bonilla v. Hurley*, 370 F.3d 494, 497 (6th Cir. 2004); *see also Buell v. Mitchell*, 274 F.3d 337, 348 (6th Cir. 2001) (citing, in part, *Coleman v. Thompson*, 501 U.S. 722, 749, 111 S.Ct. 2546 (1991)); *Rust v. Zent*, 17 F.3d 155, 160 (6th Cir. 1994).

Four factors apply to determine whether a state procedural rule bars federal habeas review:

1.   Whether there is a firmly established state procedural rule with which the petitioner failed to comply;

2.   Whether the state court actually enforced the rule in sanctioning the petitioner's failure to comply;

3.   Whether the petitioner's failure to comply with the state procedural rule constitutes an adequate and independent ground for barring federal habeas review; and

4.   Whether cause exists to dispense with the procedural rule and whether the petitioner was actually prejudiced by the alleged constitutional error or whether a failure to conduct habeas review of a claim will result in a miscarriage of justice.

*See Deitz v. Money*, 391 F.3d 804, 808-09 (6th Cir. 2004)(and cases cited therein).

Several examples clarify the sometimes complex arena of procedural defaults. Example one: the doctrine of res judicata may bar review of a federal constitutional claim that a prisoner could have raised, but did not, on direct appeal in the Ohio Court of Appeals and the Ohio Supreme Court.  *E.g., Cvijetinovic v. Eberlin*, 617 F.3d 833, 836

5

n.2 (6th Cir. 2010). Example two: the prisoner failed to file a timely notice of appeal in

the Ohio Supreme Court or a motion for leave to file a delayed appeal in compliance with

Ohio Sup. Ct. R. II, Section 2(A)(4). *E.g., Bonilla v. Hurley*, 370 F.3d 494, 497 (6th Cir.

2004). Example three: the prisoner fails to pursue his claim of constitutionally ineffective

assistance of appellate counsel in a timely application to reopen appeal under Ohio R.

App. P. 26(B) or fails to show good cause sufficient to excuse an untimely Rule 26(B)

application. *See James v. Brigano*, 470 F.3d 636, 640-41 (6th Cir. 2006) (discussing

Ohio R. App. P. 26(B)).

### B.    Tobin's First Ground for Relief

#### 1.

Respondent contends that Tobin committed a res-judicata type procedural default

on part of his first ground for relief: the part asserting that a Supremacy Clause violation

would occur if the Ohio Court of Appeals failed to remand with instructions to impose

minimum, concurrent sentences. Respondent argues that Tobin could have raised in his

appellate brief as part of his argument that his sentence violated *Blakely* and *Foster*.

#### 2.

To flesh out Tobin's claim under the Supremacy Clause, and its potential

procedural default, it is necessary to touch upon the holdings in *Blakely*, *Foster*, and their

progenitor, *Apprendi v. New Jersey*, 530 U.S. 466, 490 (2000).

In *Apprendi* the Supreme Court held, "[o]ther than the fact of a prior conviction,

any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt."  530 U.S. at 490.

In *Blakely* the Supreme Court addressed *Apprendi* as follows:

> [T]he "statutory maximum" for *Apprendi* purposes is the maximum sentence a judge may impose *solely on the basis of the facts reflected in the jury verdict or admitted by the defendant*.  In other words, the relevant "statutory maximum" is not the maximum sentence a judge may impose after finding additional facts, but the maximum he may impose *without* any additional findings.  When a judge inflicts punishment that the jury's verdict alone does not allow, the jury has not found all the facts "which the law makes essential to the punishment," and the judge exceeds his proper authority.

542 U.S. at 303-04 (citations omitted) (emphasis in original).

In *Foster* the Ohio Supreme Court applied *Blakely* to find that certain provisions in Ohio's sentencing statutes violated the Sixth Amendment.  The unconstitutional provisions permitted Ohio sentencing judges to engage in factfinding to support the imposition of a longer-than-minimum sentence or a maximum sentence or consecutive sentences.  *Foster*, 109 Ohio St.3d at 19-22.

The Ohio Supreme Court decided *Foster* after Tobin was convicted and sentenced but before the Ohio Court of Appeals issued its decision on Tobin's direct appeal. Realizing *Foster's* and *Blakely*'s potential impact, Tobin contended in the Ohio Court of Appeals that the "trial court erred when it sentenced [him] to more than minimum and concurrent terms of imprisonment."  (Doc. #7, Exh. 9 at 194) (original capitalization and emphasis removed).  The Ohio Court of Appeals agreed, explaining: "Because the trial court relied upon factors that the supreme court later held were unconstitutional, *Foster*

7

requires resentencing in this case." *State v. Tobin*, 2007 WL 867624 at *13.

This result did not fully satisfy Tobin because he had also asked the Ohio Court of Appeals to remand with an instruction to impose minimum and concurrent sentences. *Blakely* required this, or so Tobin believed.  His appellate counsel argued, "When Mr. Tobin committed the offenses he was convicted of and when he was sentenced in the trial court, Ohio's felony sentencing structure was unconstitutional.  Therefore, he could not have been sentenced to more than minimum and concurrent prison terms." (Doc. #7, Exh. 9 at 195).  The Ohio Court of Appeals disagreed:

> [W]hile a defendant may argue [on remand] for a reduction in his sentence, nothing prevents the state from seeking greater penalties.  The trial court is free to impose either the same or a different sentence on remand.
>
> As an Ohio court inferior to the Supreme Court of Ohio, we are required to followed the supreme court's mandates, and we lack the jurisdictional power to declare a mandate of the Supreme Court of Ohio. Accordingly, Tobin's argument that the mandate of the supreme court in *Foster* violates the United States Constitution is not cognizable in this court.

*State v. Tobin*, 2007 WL 867624 at *13 (internal citations omitted).  Here lies the target of Tobin's Supremacy Clause claim in the present case.  He contends that the Ohio Court of Appeals violated the Supremacy Clause by relying on *Foster* to avoid addressing the merits of his argument that *Blakely* required a remand with instructions to impose both minimum and concurrent prison terms.  (Doc. #7 at 194-95).

Respondent contends that Tobin committed a procedural default by failing to present his Supremacy Clause claim in his direct appeal to the Ohio Court of Appeals.

8

This contention lacks merit for the practical reason that Tobin's Supremacy Clause claim did not exist until the Ohio Court of Appeals issued its decision resting on *Foster* without addressing the merits of his *Blakely*-based request for minimum and concurrent sentences on remand.  The moving force behind this claim was the Ohio Court of Appeals' decision itself, not an error that appeared on the face of the record at the time Tobin filed his briefs in the Ohio Court of Appeals.  Because of this, res judicata did not require Tobin to raise his Supremacy Clause claim in the assignments of error he first raised in the Ohio Court of Appeals.  *Cf. Wong v. Money*, 142 F.3d 313, 322 (6th Cir. 1998) ("Under Ohio law, the failure to raise on appeal a claim that appears on the face of the record constitutes a procedural default under the State's doctrine of res judicata.").

Tobin first raised his Supremacy Clause claim in the Ohio Supreme Court in his Memorandum in Support of Jurisdiction.  This was procedurally insufficient, according to Respondent, because the Ohio Supreme Court will not, in general, consider arguments not raised on appeal.  Respondent looks to *Belvedere Condominium Unit Owners' Assn. v. R.E. Roark Cos., Inc*., 67 Ohio St.3d 274 (1993), where the Ohio Supreme Court stated, "As a general rule, this court will not consider arguments that were not raised in the courts below." *Id*. at 279.  This waiver doctrine does not help Respondent because it was "not absolute." *Id*.  The Ohio Supreme Court explained, "When an issue of law that was not argued below is implicit in another issue that was argued and is presented by an appeal, we may consider and resolve that implicit issue." *Id*.

Respondent's application of *Belvedere's* general rule is mistaken because

9

*Belvedere's* exception applies.  Tobin's Supremacy Clause claim was implicit in his argument in the Ohio Court of Appeals that *Blakely* required the imposition of minimum and concurrent sentences on remand.  Tobin thus argued, in essence, *Blakely*, a U.S. Supreme Court case, trumped *Foster*, an Ohio case.  And in doing so, gave voice to his Supremacy Clause claim.

Other than the arguments rejected above, Respondent does not address how Tobin could have properly presented the Ohio Court of Appeals with this claim.[6]  This likely constitutes a waiver of other asserted procedural defaults concerning Tobin's Supremacy Clause claim.  *See Smith v. Moore*, 415 Fed. Appx. 624, 628 (6th Cir. 2011)("A respondent failing to raise his procedural default challenge waives it.  'The state may waive a defense,' including procedural default, 'by not asserting it.'")(quoting in part *Baze v. Parker*, 371 F.3d 310, 320 (6th Cir. 2004)).

Additionally, the interests of judicial economy weigh in favor of proceeding to the merits of Tobin's Supremacy Clause claim, because it provides no basis for habeas corpus relief.  *See Hudson v. Jones*, 351 F.3d 212, 215-16 (6th Cir. 2003)(citing *Lambrix v. Singletary*, 520 U.S. 518, 525 (1997)("Judicial economy might counsel giving the [other] question priority, if it were easily resolvable against the habeas petition, whereas the procedural-bar issue involved complicated issues of state law."); *see also Babick v.*

---

[6]  Perhaps Tobin could have raised it in an Application for Reconsideration under Ohio R. App. P. 26(A).  Perhaps not.  *See State v. Owens*, 112 Ohio App.3d 334, 336, 678 N.E.2d 956, 957 (1996) ("An application for reconsideration is not designed for use in instances where a party simply disagrees with the conclusions reached and the logic used by an appellate court.").

*Berghuis,* 620 F.3d 571, 576 (6th Cir. 2010)("We cut to the merits here, since the cause-and-prejudice analysis adds nothing but complexity to the case.").  Before doing so, however, Respondent challenges the procedural legitimacy of Tobin's third ground for relief.

### C. <u>Tobin's Third Ground for Relief</u>

Tobin contends in his third ground for relief that the imposition of non-minimum and consecutive terms of imprisonment violated his rights under the Sixth Amendment and *Blakely*.

Respondent accurately points out that Tobin did not specify in his habeas petition which sentences he seeks to challenge: his original sentences or those he received on remand.  (Doc. #7, Exhs. 5, 13).  Respondent argues that Tobin committed a procedural default by not pursuing a direct appeal of the sentences he received on remand, which are the sentences he is now serving.  At first glance this appears correct because Tobin has never challenged in the Ohio courts the sentence he received on remand.  Deeper reflection reveals, however, that Tobin has a valid point: he litigated in both the Ohio Court of Appeals and the Ohio Supreme Court his claim that *Blakely* mandated the imposition of minimum and concurrent sentences on remand.  Returning to the trial court, he again received non-minimum and consecutive sentences.  Yet he had already once attempted, without success, to convince the Ohio Court of Appeals and the Ohio Supreme Court that such sentences violated *Blakely*.  In doing so, he gave those courts a fair opportunity to address the merits of the *Blakely* claim he raises in his third ground for

11

relief of his habeas petition. He need not do more to avoid a procedural default. *Cf. O'Sullivan v. Boerckel*, 526 U.S. 838, 842, 845 (1999) ("Section 2254(c) requires only that state prisoners give state courts a fair opportunity to act on their claims." "[S]tate prisoners must give the state courts one full opportunity to resolve any constitutional issues by invoking one complete round of the State's established appellate review process."). This conclusion, moreover, works no insult to the doctrine of comity because both the Ohio Court of Appeals and the Ohio Supreme Court faced Tobin's *Blakely* claim and had a fair opportunity to provide the relief Tobin thought *Blakely* and the Sixth Amendment demanded – again, the imposition on remand of minimum and concurrent sentences.

Accordingly, Tobin did not commit a procedural default and, hence, did not waive federal habeas review of his third ground for relief.

## IV.    **Substantive Review**

### A.    **Habeas Corpus and the AEDPA's[7] Standards of Review**

#### 1.

United States District Courts have the authority to grant a writ of habeas corpus to a prisoner who is state custody "in violation of the Constitution . . . of the United States." 28 U.S.C. §2241(a), (c)(3). "The writ of habeas corpus plays a vital role in protecting

---

[7] The AEDPA refers to the Antiterrorism and Effective Death Penalty Act. It is codified in part in 28 U.S.C. §2254. *See* Pub.L. No. 104-132, 110 Stat. 1214.

constitutional rights." *Slack v. McDaniel*, 529 U.S. 473, 483, 120 S.Ct. 1595 (2000).

 The AEDPA significantly constricts the reach of the writ of habeas corpus "'with respect to claims adjudicated on the merits in state court.'" *Coomer v. Yukins*, 533 F.3d 477, 484 (6th Cir. 2008)(quoting *Williams v. Taylor*, 529 U.S. 362, 412, 120 S.Ct. 1495 (2000)). Such state-court decisions do not warrant habeas relief under the AEDPA "unless the adjudication of the claim ... resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States . . . ." 28 U.S.C. §2254(d)(1); *see Washington v. Renico*, 455 F.3d 722, 728 (6th Cir. 2006).

 "The [AEDPA's] 'contrary to' clause is satisfied 'if the state court arrive[d] at a conclusion opposite to that reached by [the U.S. Supreme] Court on a question of law or if the state court decide[d] a case differently than [the U.S. Supreme] Court has on a set of materially indistinguishable facts." *Villagarcia v. Warden*, 599 F.3d 529, 533 (6th Cir. 2010) (quoting in part *Williams v. Taylor*, 529 U.S. 362, 413 (2000) (brackets added in *Villagarcia*).

 "Under [the AEDPA's] 'unreasonable application' clause..., a federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." *Villigarcia*, 599 F.3d at 533 (quoting *Williams*, 529 U.S. at 411); *see Lovell v. Duffey*, 629 F.3d 587, 594 (6th Cir. 2011). The "AEDPA thus imposes a 'highly deferential standard for evaluating

state-court rulings,' which demands that state-court decisions be given the benefit of the

doubt." *McKinney v. Ludwick* , 649 F.3d 484, 488 (6th Cir. 2011)(quoting in part

*Woodford v. Visciotti*, 537 U.S. 19, 24 (2002))(other citations omitted).

## 2.

 If the state court did not address or resolve fairly presented federal constitutional

claims, its decision does not constitute an "adjudication on the merits" under §2254(d).

"Thus, a federal habeas court reviews such unaddressed claims de novo." *Howard v.*

*Bouchard*, 405 F.3d 459, 467 (6th Cir. 2005) (citing *McKenzie v. Smith*, 326 F.3d 721,

727 (6th Cir. 2003)(distinguishing "no results" from no reasoning)).  "Where, however,

the state court disposes of a constitutional claim but fails to articulate its analysis, the rule

is less clear." *Howard*, 405 F.3d at 467.  In this situation, rather than conducting a de

novo review of the state court's decision, the United States Court of Appeals for the Sixth

Circuit has "taken an intermediate approach – in between de novo review and complete

deference...." *Id*.  Under the intermediate approach, "a federal habeas court must conduct

an independent review of the record and applicable law to determine whether, under the

AEDPA standard, the state court decision is contrary to federal law, unreasonably applies

clearly established law, or is based on an unreasonable determination of the facts in light

of the evidence presented.  The independent review, however, is not a full, de novo

review of the claims.... [T]he review remains deferential, because the court cannot grant

relief unless the state court's result contradicts the strictures of AEDPA." *Howard*, 405

F.3d at 467-68 (citing *Harris v. Stovall,* 212 F.3d 940, 943 (6th Cir. 2000)) (other citation

14

omitted).

**B.** **Tobin's Second Ground for Relief**

**1.**

Tobin claims that his trial counsel provided ineffective assistance in violation of his rights under the Sixth and Fourteenth Amendments and that the Ohio Court of Appeals unreasonably applied *Strickland v. Washington*, 466 U.S. 668 (1984) when analyzing this claim.

To establish constitutionally ineffective assistance of counsel (IAC), a convicted defendant must show that his trial counsel's acts, errors, or omissions fell below an objective standard of reasonableness. *Strickland,* 466 U.S. at 687-88. This demanding standard requires the convicted defendant to establish that (1) defense counsel provided deficient performance and (2) the deficient performance prejudiced the defense so as to render his trial fundamentally unfair and the result unreliable. *Id.*

Because the AEDPA precludes a *de novo* review of constitutional claims, *see Price v. Vincent*, 538 U.S. 634, 639 (2003), a federal habeas petitioner carries a heavy burden when attempting to establish an IAC claim. "The Supreme Court has made clear that post-AEDPA claims of ineffective assistance of counsel brought by habeas petitioners will succeed only in very limited circumstances.... For [the petitioner] to succeed..., he must do more than show that he would have satisfied *Strickland*'s test if his claim were being analyzed in the first instance, because under §2254(d)(1), it is not enough to convince a federal habeas court that, in its independent judgment, the state-

15

court decision applied *Strickland* incorrectly. Rather, he must show that the ... [state] Court of Appeals applied *Strickland* to the facts of his case in an objectively unreasonable manner." *Payne v. Bell*, 418 F.3d 644, 665 (6th Cir. 2005).

**2.**

The Ohio Court of Appeals' decision correctly described *Strickland*'s standards. (Doc. #7, Exh. 12 at 245-46). Its decision, therefore, was not contrary to clearly established federal law. The AEDPA inquiry thus turns to whether the Ohio Court of Appeals unreasonably applied *Strickland* to Tobin's IAC claim.

Tobin argued in the Ohio Court of Appeals that his counsel provided ineffective assistance by permitting the prosecution to show the jury a videotape of Detective Alonzo Wilson's interrogation of Tobin, during which Wilson repeatedly vouched for D.J.'s and E.T.'s credibility. *See* Doc. #7, Exh. 12 at 245. Although the Ohio Court of Appeals did not agree fully with Tobin's assertions, it did agree with him in significant part. The Ohio Court of Appeals' decision states:

> [W]e are particularly troubled that the jury heard Wilson's statement that he was in "a business of being around a lot of eight-year-olds" and suggesting that none had described the sexual conduct involved from their imaginations and without something having happened to them. This comment invited the jury to rely upon Wilson's expertise as an officer who had previously investigated sexual abuse of children and to accept his assertion that C.J. would not have fabricated her specific allegations due to her imagination. This comment was followed by other statements [by Wilson] that C.J. and E.T. were not "making this up."
>
> In our view, Wilson's statements during the interview constituted improper evidence of a perceived expert as to the veracity of the children's allegations. Accordingly, Tobin's counsel should have object to the playing

16

of the videotape of Tobin's interrogation, and his failure to do so, in light of *Boston*, was unreasonable.

(Doc. #7, Exh. 12 at 251-52)(referring to, and previously discussing, *State v. Boston*, 46 Ohio St.3d 108 (1989)). In the present case, Tobin has no quarrel with this aspect of the Ohio Court of Appeals' decision. He instead focuses on the Ohio Court of Appeals' finding that defense counsel's mistake in failing to object to certain portions of the videotape did not cause sufficient prejudice to meet *Strickland's* second prong. He asserts that when analyzing the prejudice prong of the *Strickland* test for ineffective assistance of counsel, the Ohio Court of Appeals "failed to look at the record as a whole. Rather it focused its prejudice inquiry on isolated factors to the exclusion of other factors that influenced the jury's verdict." (Doc. #2 at 48).

Under *Strickland's* prejudice requirement, "It is not enough for the defendant to show that the errors had some conceivable effect on the outcome of the proceedings." 466 U.S. at 693. "On the other hand . . . a defendant need not show that counsel's deficient conduct more likely than not altered the outcome in the case." *Id*. "[T]he question is whether there is a reasonable probability that, absent the errors, the factfinding would have had a reasonable doubt respecting guilt. . . ." *Id*. at 694. "The defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id*.

In making this determining, a court hearing an ineffectiveness claim must consider the totality of the evidence before the judge or jury. Some of

17

the factual findings will have been unaffected by the errors, and factual findings that were affected will have been affected in different ways. Some errors will have had a pervasive effect on the inferences to be drawn from the evidence, altering the entire evidentiary picture, and some will have had an isolated, trivial effect. Moreover, a verdict or conclusion only weakly supported by the record is more likely to have been affected by errors than one with overwhelming record support. Taking the unaffected findings as a given, and taking due account of the effect of the errors on the remaining findings, a court making the prejudice inquiry must ask if the defendant has met the burden of showing that the decision reached would reasonably likely have been different absent the errors.

*Strickland*, 466 U.S. at 695-96.

Tobin contends, "the state court of appeals failed to consider the totality of evidence to which the jury was exposed. Most critically, the court failed to consider the impact of the improperly bolstering of C.J.'s credibility upon the jury's assessment of ET's credibility. This was fatal error. . . ." (Doc. #11 at 779).

Tobin's arguments fail to demonstrate that the Ohio Court of Appeals unreasonably applied *Strickland*'s prejudice prong. The Ohio Court of Appeals explored and analyzed Tobin's *Strickland*/prejudice arguments in detail and at length as follows:

Tobin argues that the jury's viewing of the videotape was prejudicial, because C.J.'s and E.T.'s credibility "was the central issue in the case. It was their word against Mr. Tobin's." Tobin notes that a physical examination revealed no evidence of sexual abuse on either C.J. or E.T.

Because the charges regarding C.J. and E.T. were distinct and separate, we review the evidence as to each child separately.

C.J. testified that she would go to Tobin's home before school because Patty Tobin, her babysitter and Tobin's daughter, had to go to work. C.J. also went to Tobin's house after school. C.J. testified that, while she was in the bathroom at Tobin's house, Tobin instructed her to undress.

Tobin then touched her "privates" with his finger.

Wilson testified that he informed Tobin of the charges by E.T. and C.J. and asked him if the girls were lying. Wilson testified that Tobin told him that if the children were lying, he would tell him; Wilson stated that Tobin never indicated that the children were lying. Wilson also testified that, after viewing the charges, Tobin stated "Not all of those are true."

Jennifer Stutesman, Tobin's girlfriend for the last 26 years, testified on Tobin's behalf that she and Tobin would usually watch television and drink coffee while C.J. was at their home in the morning, and that they often fed C.J. After C.J. ate, they would tell her to wash her face and get ready for school. C.J. went into the bathroom at their house, but Stutesman stated that there were no opportunities for Tobin to enter the bathroom and be alone with C.J. without Stutesman noticing. Stutesman later admitted that there may have been times that Tobin was alone with C.J. Testifying on his own behalf, Tobin denied that he molested C.J. He specifically denied touching her chest, vaginal area, or bottom. There was no physical evidence substantiating the alleged abuse.

With regard to C.J., we agree with Tobin that Wilson's videotaped statements were prejudicial. Wilson's statements strongly supported C.J.'s credibility by suggesting that he had had a lot of experience with children near C.J.'s age and that an eight-year old's imagination would not include the allegations C.J. made. There was no evidence, other than C.J.'s statements and Tobin's statements to Wilson, to support the claims concerning C.J. More significantly, the jury asked during deliberations whether it could consider the evidence concerning E.T. to make a verdict on C.J.'s charges. This strongly suggests that the jury did not believe that the state's evidence regarding C.J. – by itself – was sufficient to support a conviction. In sum, the playing of the videotaped interview undermines our confidence in Tobin's conviction on count one, and that conviction must be reversed.

Turning to E.T., E.T. described at trial numerous incidents where she was asked to perform fellatio and where Tobin performed cunnilingus on her. E.T. testified that in August 2003, Tobin was putting lotion on her back in Tobin's bedroom; E.T. indicated that she had very dry skin and needed to have lotion applied often to avoid the skin cracking. E.T. stated that Tobin told her to remove her shirt and then sucked on her breasts. Tobin then told E.T. to remove her shorts; afterward, he sucked and kissed

her vagina. Tobin also told E.T. to kiss and put her mouth around his penis. E.T. testified that Tobin's penis was not erect and that he did not ejaculate. Afterwards, Tobin told E.T. to lie on the bed again, and he inserted two fingers into her vagina.

In December 2003, E.T. was staying at Tobin's home while her brother recovered from surgery. On one Friday when E.T. was alone with Tobin, Tobin told E.T. to go back to the bedroom and take off her clothes. When she did not, Tobin told her to take off her clothes again. Tobin instructed E.T. to perform fellatio, which she did, then he performed cunnilingus on her and sucked and kissed her breasts. Tobin then told E.T. to lie on the bed, and he moved a vibrator in and out of her vagina. E.T. identified the vibrator, which was marked as state's exhibit 1.

As detailed above, E.T. also testified that Tobin engaged in sexual activity with her on several occasions while returning from delivering newspapers and in the summer of 2004.

Mark Losko, a forensic scientist in the DNA serology section of the Ohio Bureau of Criminal Identification and Investigation, testified that DNA consistent with E.T. was found on the vibrator identified by E.T. (this was also referred to as a dildo); Losko did not find DNA on a second "sex toy" seized from the same drawer in Tobin's bedroom.

Again, Wilson testified that he informed Tobin of the charges by E.T. and C.J. and asked him if the girls were lying. Wilson testified that Tobin told him that if the children were lying, he would tell him; Wilson stated that Tobin never indicated that the children were lying. Wilson also testified that, after viewing the charges, Tobin stated "Not all of those are true."

In his defense, Stutesman testified that Tobin drove E.T. on her paper route "occasionally" and that she went with him most of the time. Stutesman stated that E.T.'s brother would also usually come with her. Stutesman indicated that the route would take approximately one-half hour and that she never noticed them return late or slower than usual. Stutesman further stated that E.T. had opportunities to play in Tobin's and her bedroom without being noticed and that E.T. could have had access to her vibrator. Stutesman also testified that E.T. had a disagreement with Tobin when Tobin refused to buy E.T. a car. On cross-examination, however, Stutesman also admitted that there were multiple times that Tobin was alone

with E.T. while delivering newspapers and in the house.  Stutesman stated, though, that she believed the accusations were lies.

During his testimony, Tobin categorically denied all of E.T.'s allegations.  He denied touching her vaginal area and fondling her breasts. He also denied showing or using a vibrator on E.T. or touching E.T. while he was driving his vehicle.  Tobin indicated that he "didn't believe in" oral sex because "the Bible says that's a no-no."  Tobin expressed that E.T. "lies a lot and then tries to cover it up."  Tobin acknowledged that he was impotent.

Upon review of the evidence, we do not find that there was a reasonable probability that the result of the trial regarding E.T.'s charges would have been different had the videotaped interview not been played. Most of the objectionable portions of the videotape concerned statements that Wilson made while discussing C.J.'s – not E.T.'s – allegations.  Wilson repeatedly referred to the fact that an eight-year old would not have the imagination to fabricate the allegations that C.J. presented.  After raising E.T.'s allegations with Tobin, Wilson referred to the fact that both girls had made allegations.  However, Wilson's statements in this respect merely verbalized what the jury already knew from having heard the testimonies of both C.J. and E.T. at trial.  On the videotape, Wilson stated to Tobin that he knew what happened to E.T. because she had provided details.  When the jury heard the videotape, E.T. had already testified and provided detailed evidence of several incidents where Tobin touched her breasts and vaginal area, required her to perform fellatio, and performed cunnilingus.

Moreover, Tobin made statements during the interview that supported the state's case.  As testified by Wilson at trial, Tobin read the charges and stated that "Not all of those are true."  Wilson also testified at trial that Tobin had not stated during the interview that the girls were lying. Tobin stated during the interview that "a lot of things has got blowed out of proportion."  Although Tobin denied at trial that he had put lotion on E.T. while in the bedroom, Tobin admitted in his interview with Wilson that he had put "oil" on E.T. as she laid on the bed and that E.T. would "get[ ] out of the shower.  I put a little bit of oil on her.  She gets dressed."

After the videotape was shown, E.T.'s statement that a vibrator was inserted into her vagina was corroborated by Losko's testimony that her DNA was present on a vibrator found in Tobin's bedroom. E.T. also testified that Tobin's penis was not erect when she performed oral sex,

which was consistent with Tobin's admission that he is impotent.  Although Stutesman provided evidence that Tobin lacked opportunities to commit the offenses, her testimony was undermined during cross-examination, and it was contradicted at times by Tobin himself.

Although Tobin repeatedly denied that he had committed the offenses against E.T., we do not find that videotape of Wilson's statements during his interview with Tobin undermines our confidence in the outcome of the trial regarding the charges related to E.T.  While there is a *possibility* that the objectionable portions of Wilson's statements on the videotape were considered by the jury, we do not find a reasonable *probability* that the outcome would have been different on the charges concerning E.T.

(Doc. #7, Exh. 12 at 252-56)(italics in original).

In light of the evidence presented at trial, both for and against Tobin, the AEDPA mandates deference to the Ohio Court of Appeals' rejection of his prejudice arguments. Whether its decision was right or wrong under a de novo application of *Strickland*, the Ohio Court of Appeals reached a reasoned conclusion grounded on the evidence and record.  Consequently, even if wrong, it was reasonably so, and Tobin's *Strickland* claim fails under the deferential review the AEDPA mandates.  *See Lovell*, 629 F.3d at 598 ("If a state court's decision on a constitutional question is 'a close call,' that fact 'militates against the conclusion that the state court's application of the relevant Supreme Court precedent was objectively unreasonable.'").

Tobin further points out that during deliberations, the jury asked the trial judge if it could consider "E.T.'s allegations when considering C.T.'s case. . . ."  (Doc. #2 at 48). Tobin states that the trial judge "explicitly answered, '[i]n deciding any count . . . you should consider all the evidence presented at trial that has bearing or will assist you in

22

deciding that count or counts.'"  *Id.* (quoting, in part, *State v. Tobin*, doc. #7, Exh. 12 at 257-58).  Tobin argues, "Given the circumstances of this case, including this instruction, the jury in all probability succumbed to the temptation to credit ET's credibility based upon CJ's improperly bolstered credibility. . . .  The court of appeals overlooked this vital question entirely."  (Doc. #2 at 48).

Defense counsel did not provide ineffective assistance because, as the Ohio Court of Appeals noted, he objected to this instruction.  In doing so, his performance did not fall below the objective standard of reasonableness required to demonstrate deficient performance under *Strickland*.  Tobin therefore overlooks that, accepting that the trial judge erred by giving this instruction, his counsel's performance did not cause any prejudice flowing from the trial judge's error.  Tobin apparently does not argue otherwise.  He instead connects the trial judge's error to Detective Wilson's bolstering of C.T. credibility, arguing that "The jury likely arrived at the same improper conclusion Detective Wilson described in the videotape. 'I know it happened because now I go two girls telling me it happened.'" (Doc. #2 at 48).

When addressing Tobin's challenge to the trial judge's instruction – not his IAC claim – the Ohio Court of Appeals concluded that it constituted prejudicial error on count one, concerning C.T., but not on the counts concerning E.T.  The court explained:

> Although the trial court's response constituted prejudicial error concerning Tobin's conviction on count one, we find no evidence that the response had the same prejudicial effect on Tobin's convictions concerning E.T.  The jury's question asked whether the evidence concerning E.T.'s case could be considered in deciding C.J.'s case; it did not ask the converse

– whether the evidence concerning C.J.'s case could be considered to make a verdict on E.T.'s case.

E.T.'s case was the stronger of the two.  Although there was no evidence from a physical examination of the victims to support sexual activity, E.T. testified that Tobin's penis was not erect and that he did not ejaculate during fellatio, which was consistent with Tobin's and Stutesman's testimony that Tobin has not been able to have an erection due to medical reasons for several years.  E.T.'s DNA was found on the vibrator, which E.T. testified Tobin had inserted into her vagina.  Although Tobin denied that he engaged in sexual activity with E.T. or C.J., he never indicated to Wilson that the children were lying, and he stated that "not all of [the charges] are true," which suggested that some might be true.  Whereas C.J.'s case relied almost exclusively upon her testimony, E.T.'s case was supported by some additional evidence.  Considering the wording of the jury's question and the record as a whole, we find that the trial court's erroneous clarification of the jury instructions was harmless beyond a reasonable doubt as to the counts related to E.T.

(Doc. #7, Exh. 12 at 259-60).

Respondent correctly points out that under *Strickland's* prejudice prong, the Ohio Court of Appeals was not required to review other purported errors, such as the one it identified above.  *Strickland* focuses the IAC-prejudice analysis on the probable effect counsel's deficient performance had on the outcome of the trial considering the totality of the evidence.  *Strickland* did not require the Ohio Court of Appeals to meld into the IAC-prejudice analysis impact of the trial judge's erroneous response to the jury's question.  *Cf. Strickland*, 466 U.S. at 695-96. ("In making this determining, a court hearing an ineffectiveness claim must consider the totality of the evidence before the judge or jury. . . ."). Additionally, the evidence against Tobin concerning E.T. was sufficiently strong to support the Ohio Court of Appeals' rejection, under *Strickland*, of Tobin's IAC-prejudice

24

arguments.

Accordingly, Tobin has not shown that the Ohio Court of Appeals' decision was either contrary to, or unreasonably applied *Strickland* or other clearly established federal law as determined by the Supreme Court.

### C. Tobin's First and Third Grounds for Relief

Tobin claims (in his third ground for relief) that the Ohio Court of Appeals imposition of non-minimum and consecutive sentences violated his rights under the Sixth Amendment and *Blakely*, 542 U.S. 296. This claim also forms the foundation of his assertion (in his first ground for relief) the under the Supremacy Clause, *Blakely* required the Ohio Court of Appeals to instruct the sentencing judge to impose, on remand, minimum and concurrent terms of imprisonment. He reasons that the Supremacy Clause mandated this "notwithstanding any provision of [s]tate law, including a decision of the Ohio Supreme Court like *Foster*." (Doc. #2 at 47).

These claims fail because *Blakely* did not require the Ohio Court of Appeals to instruct the sentencing judge to impose minimum and concurrent sentences on remand. The Supreme Court did not remand *Blakely* with the instruction to impose minimum and concurrent sentences. Rather, it remanded *Blakely* "for further proceedings not inconsistent with this opinion." 542 U.S. at 314. *Blakely*'s text does not contain the holding that the Sixth Amendment required the sentencing judge to impose, on remand, a specific sentence – whether minimum, concurrent, or otherwise. Tobin, moreover, does not rely on a U.S. Supreme Court case holding that the occurrence of a *Blakely* error

requires a remand for the imposition of minimum or concurrent sentences.  At least one

Supreme Court case since *Blakely* (and *Apprendi*) dictates otherwise, in part, holding that

the Sixth Amendment does not preclude sentencing judges from resolving factual issues

when deciding whether to impose consecutive sentences.  *Oregon v. Ice*, 555 U.S. 160

(2009).

Tobin, in short, does not point to a U.S. Supreme Court case holding that *Blakely*

required the Ohio Court of Appeals to remand for the imposition of minimum and

concurrent sentences or that the remedy the Ohio Supreme Court's spelled out in *Foster*

conflicted with *Blakely* and the Sixth Amendment.  As a result, Tobin has failed to show

that the Ohio Court of Appeals' decision to remand pursuant to *Foster* was contrary to, or

involved an unreasonable application of, *Blakely* or any other clearly established federal

law as determined by the Supreme Court.

Tobin argues that the Ohio Court of Appeals' decision violated his rights under the

Due Process Clause by refusing to address the merits of his *Blakely* claim that he was

entitled to a remand for the imposition of minimum and concurrent prison terms.

Although Tobin relies on Supreme Court cases concerning the existence of due process

protections on direct appeals, *see Evitts v. Lucey*, 469 U.S. 387 (1985); *see also Griffin v.

Illinois*, 351 U.S. 12 (1956), the Ohio Court of Appeals' decision was not contrary to, and

did not involve an unreasonable application, of these cases.  This is so because the Ohio

Court of Appeals provided Tobin with due process by recognizing that his *Blakely*

argument and by rejecting it based on a pertinent and controlling Ohio Supreme Court,

which did not run afoul of *Blakely*.

Relying on *Dvorak v. Walker*, 1999 WL 1023978 (6th Cir. 1999), Tobin points out that the United States Court of Appeals has granted habeas relief "on the ground that an Ohio appellate court's refusal to consider the merits of a timely appeal from a conviction violates due process." (Doc. #11 at 776). *Dvorak* is easily distinguished from the present case. The due process violation occurred in *Dvorak* because the Ohio courts did not review the merits of his claims at any time. 1999 WL 1023978 at *2. In Tobin's case, the Ohio Court of Appeals considered and rejected his request under *Blakely* for a remand with an instruction to impose minimum and concurrent sentences. In doing so, the Ohio Court of Appeals provided Tobin with meaningful review and, hence, with the process he was due.

Accordingly, Tobin's first and third grounds for relief fail to show that the Ohio Court of Appeals' decision was contrary to, or involved an unreasonable application of, clearly established federal law as determined by the Supreme Court.

## V.    **Certificate of Appealability**

Before a petitioner may appeal a denial of his habeas petition, he must first obtain a certificate of appealability. 28 U.S.C. §2253(c)(1)(A). To obtain a certificate of appealability when a habeas petition is denied on the merits, the petitioner must make a substantial showing of the denial of a constitutional right. *Slack v. McDaniel*, 529 U.S. 473, 484, 120 S.Ct. 1595 (2000). This is accomplished by showing that reasonable jurists

27

could debate whether the petition should have been resolved in a different manner or that the issues presented were adequate to deserve encouragement to proceed further. *Slack*, 529 U.S. at 484, 120 S.Ct. at 1604. If the District Court dismisses the petition on procedural grounds without reaching the merits of the constitutional claims, the petitioner must show that jurists of reason would find it debatable whether the District Court is correct in its procedural ruling. *Slack*, 529 U.S. at 484, 120 S.Ct. at 1604.

The conclusions reached in the instant Report are not debatable by jurists of reason and the case does not otherwise present issues adequate to deserve encouragement to Tobin to proceed further. Consequently, a certificate of appealability should not issue in this case.

## IT IS THEREFORE RECOMMENDED THAT:

1.    Dale Tobin's Petition for Writ of Habeas Corpus (Doc. #2) be DENIED and DISMISSED;

2.    Tobin be denied leave to appeal *in forma pauperis* pursuant to 28 U.S.C. §1915(a) and be denied any requested certificate of appealability under 28 U.S.C. §2253(c); and

3.    The case be terminated on the docket of this Court.


October 4, 2011

                                           s/Sharon L. Ovington
                                               Sharon L. Ovington
                                     United States Magistrate Judge

## NOTICE REGARDING OBJECTIONS

Pursuant to Fed. R. Civ. P. 72(b), any party may serve and file specific, written objections to the proposed findings and recommendations within fourteen days after being served with this Report and Recommendations.  Pursuant to Fed. R. Civ. P. 6(d), this period is extended to seventeen days because this Report is being served by one of the methods of service listed in Fed. R. Civ. P. 5(b)(2)(C), (D), (E), or (F).  Such objections shall specify the portions of the Report objected to and shall be accompanied by a memorandum of law in support of the objections.  If the Report and Recommendations are based in whole or in part upon matters occurring of record at an oral hearing, the objecting party shall promptly arrange for the transcription of the record, or such portions of it as all parties may agree upon or the Magistrate Judge deems sufficient, unless the assigned District Judge otherwise directs.  A party may respond to another party's objections within fourteen days after being served with a copy thereof.

Failure to make objections in accordance with this procedure may forfeit rights on appeal.  *See United States v. Walters*, 638 F.2d 947 (6th Cir. 1981); *Thomas v. Arn,* 474 U.S. 140 (1985).